OPINION
These appeals are taken from final judgments of the Domestic Relations Division of the Portage County Court of Common Pleas. Appellant/cross-appellee, Richard J. Frederick, appeals from the division of property and support awards as decreed by the trial court in a divorce proceeding. Appellee/cross-appellant, Deborah I. Frederick, cross appeals from other aspects of the divorce decree.[1] For the following reasons, we affirm the judgments of the trial court in part, reverse the judgments in part, and remand the matter for further proceedings.
Appellant and appellee were married on December 11, 1976 in Bedford, Ohio. Three children were born as issue of the marriage: a daughter in 1977; a second daughter in 1979; and a son in 1987. Appellee filed a complaint for divorce on September 5, 1997. She alleged gross neglect of duty, adultery, incompatibility, and extreme mental cruelty as grounds for the divorce. Appellant filed an answer in which he counterclaimed for divorce.
The contested divorce came on for trial on March 10, 1998 and April 7, 1998. Appellant and appellee were represented by counsel, and both testified during the proceedings. The parties introduced numerous exhibits into evidence and also submitted a variety of written stipulations to assist the trial court.
On June 10, 1998, the trial court issued its judgment dissolving the marriage and granting the parties a divorce on the basis of their incompatibility. In the divorce decree, the trial court adopted a shared parenting plan that the parties had previously submitted. Pursuant to the plan, appellee was named as the primary residential parent of the parties' minor son, who was the only remaining unemancipated child at the time of the divorce. The trial court also divided the marital property and debts between the parties and ordered appellant to pay both spousal and child support to appellee.
Following the issuance of this decree, appellee filed a motion in the trial court on June 24, 1998. It was captioned "Plaintiff's Motion for Clarification of Judgment Entry pursuant to Civil R.59(A)." In this motion, appellee requested that the trial court clarify three matters that were either not addressed or were left ambiguous by the original divorce decree. These matters included the distribution of appellant's pension plan with the Public Employees Retirement System, the allocation of a credit card debt between the parties, and the question of attorney fees. The trial court, however, did not rule on the motion.
Shortly thereafter, on July 8, 1998, appellant filed a notice of appeal with this court from the trial court's entry of the divorce decree. In an effort to preserve her right to seek modification of the decree, appellee filed a notice of cross appeal on August 5, 1998.
This court raised the issue of the timeliness of appellee's cross appeal under App.R. 4. Upon review of the record, we determined that pursuant to certain language in Civ.R. 59, appellee was within her rights to invoke the rule to request that the trial court open its previous judgment for the purpose of addressing the three items referenced in her motion for a new trial.[2] Since appellee's June 24, 1998 motion was validly brought pursuant to Civ.R. 59, we concluded that the time for filing the appeal and cross appeal was tolled under App.R. 4(B)(2). As a result, we viewed the notices of appeal and cross appeal as being prematurely filed.
In a judgment entry filed on January 6, 1999, this court remanded the matter to the trial court for the purpose of ruling on appellee's Civ.R. 59 motion. On remand, the trial court issued a judgment entry on February 2, 1999. In this entry, the trial court ruled on the three items raised by appellee's motion for a new trial.
Prior to the case being remanded, appellant filed his brief on appeal. In this brief, appellant set forth the following assignments of error:
 "[1.] The Trial Court erred as a matter of law to the prejudice of Appellant and abused its discretion when it determined that those assets which can be specifically traced to the appellant before the marriage were marital assets, specifically the marital residence at 248 Ashgrove, Aurora, OH.
 "[2.] The Trial Court erred as a matter of law and abused its discretion in decreeing as marital assets those assets which can specifically be traced to the appellant before the marriage, specifically the real estate at 261 Center Road, Bedford, OH.
 "[3.] The Trial Court erred as a matter of law and abused its discretion in decreeing as marital assets the entire value of those assets which can specifically be traced to monies paid by the Appellant's business of which he holds only a 1/2 interest, specifically the 1995 Monte Carlo, the 1995 Buick Riviera and the 1997 Chevrolet Lumina.
 "[4.] The Trial Court abused its discretion in the division of property by finding that the debts incurred by Appellee, subsequent to the filing of the within divorce and after the effective date of the Appellant's temporary support obligation, were marital debts which was clearly against the manifest weight of the evidence.
 "[5.] The Trial Court erred by dividing Appellant's benefits from the Police And Fireman's Pension and Disability Funds as both an asset and as income for support purposes.
 "[6.] The Trial Court erred as a matter of law by failing to consider the cost for health care benefits paid by Appellant in the calculation of child support."
After the trial court ruled on appellee's Civ.R. 59 motion by way of the February 2, 1999 judgment entry, appellant filed a motion with this court in which he requested leave to file a supplemental brief. In support of the motion, appellant observed that the trial court had ruled on items that were not previously addressed by the divorce decree; therefore, such rulings were not subject to challenge in his first brief. This court granted appellant leave to file a second brief.
In his supplemental brief, appellant presented the following assignments of error:
 "[7.] The Trial Court erred as a matter of law to the prejudice of Appellant and abused its discretion when it determined that Appellee's portion of Appellant's interest in the Public Retirement System Pension should be distributed to her from the equity in the marital residence.
 "[8.] The Trial Court erred as a matter of law to the prejudice of Appellant and abused its discretion when it distributed Appellee's portion of Appellant's interest in the Public Retirement System Pension from the equity in the marital residence without considering the income tax consequences pertinent to the pension funds."
 "[9.] The Trial Court erred as a matter of law to the prejudice of Appellant and abused its discretion when it distributed Appellee's portion of Appellant's interest in the Public Retirement System Pension as a lump sum distribution and failed to consider same as income to Appellee in determining spousal support."[3]
Appellee filed both a brief and a supplemental brief responding to appellant's proposed errors. In her primary answer brief, appellee assigned the following as error on cross appeal:
 "[10.] The trial court abused its discretion when it failed to award Cross-Appellant attorney fees.
 "[11.] The trial court abused its discretion when it failed to include the balance of the parties [sic] Metropolitan Checking Account in the division of assets."[4]
Obviously, the instant appeals present a veritable barrage of proposed errors challenging numerous aspects of the divorce decree. We begin our analysis forthwith.
 I.
In his first assignment of error, appellant posits that the trial court erred by finding the parties' residence at 248 Ashgrove Circle in Aurora, Ohio to be marital property subject to division and distribution.[5] According to appellant, virtually all of equity which currently exists in 248 Ashgrove should have been distributed to him as his separate property.
The following facts are relevant with respect to how the parties came to purchase and reside in the home at 248 Ashgrove. At the time of the parties' marriage in December 1976, appellant owned a parcel of property that consisted of approximately 1.5 acres of land. The property was located at 212 Solon Road in Bedford, Ohio. In May 1977, this property was subdivided into two lots, with the new tract of land being designated as 214 Solon Road. The deed to 214 Solon was recorded in both parties' names. During the following month, appellant sold 212 Solon to a purchaser, which resulted in net sale proceeds of $35,954.
At that time, the lot at 214 Solon was still vacant and had an approximate value of $20,000. The parties, thereafter, used all of the proceeds from the sale of 212 Solon to build a residence on 214 Solon. The parties financed the balance of the construction costs with a bank loan. The parties then lived in the marital residence at 214 Solon for the next seventeen years.
In March 1994, the parties consummated the purchase of the land and a partially completed house at 248 Ashgrove. The title to this property was recorded in both parties' names. In order to help finance the purchase of 248 Ashgrove, the parties took out a $46,826.07 home equity loan based on the equity accrued in the marital residence at 214 Solon. The proceeds from this loan were used as the down payment on 248 Ashgrove, thereby reducing the $236,000 purchase price. After applying the loan as the down payment, the parties financed the balance of the $236,000 through an earnest deposit and a bank mortgage.
Once they acquired 248 Ashgrove, the parties sold the marital residence at 214 Solon for $134,000 in July 1994. Portions of these sale proceeds were used to pay off the balance of the existing mortgage on 214 Solon and the $46,826.07 home equity loan that had previously been used as the down payment on 248 Ashgrove. Upon covering these costs, the net proceeds from the sale of 214 Solon were $53,116. These proceeds were deposited into a joint credit union checking account maintained by the parties.
When the parties purchased 248 Ashgrove in March 1994, the house on the property was only partially completed. After the parties finalized the sale of 214 Solon in July 1994, a portion of the $53,116 in net sale proceeds was used to finish the flooring, painting, landscaping, and the building of a deck on the house at 248 Ashgrove. The parties then resided there until appellee moved out and filed for divorce in late 1997.
In the divorce decree, the trial court disposed of the marital residence at 248 Ashgrove in the following manner:
 "The marital residence, 248 Ash Grove Circle, (fair market value $265,000) shall be sold and the proceeds shall be divided equally between the parties.
 "The Court notes that Husband used $55,954 of the premarital funds or assets in the purchase of the prior marital residence [214 Solon], but none of the sale proceeds from the prior residence were used for the purchase of the 248 Ash Grove residence. Further, the Court notes that all titles, deeds, loans, mortgages pertaining to the Ash Grove Circle residence were in both names.
 "Husband may, at his option, purchase Wife's interest in said residence for one-half of the residence equity based on a fair market value of $264,000 and a mortgage of $181,000."[6]
Thus, the trial court treated the residence at 248 Ashgrove entirely as a marital asset subject to division and distribution. On appeal, appellant claims that the trial court erred in this regard.
Upon granting a divorce, the trial court is required to divide and distribute the marital estate between the parties in an equitable manner. Holcomb v. Holcomb (1989), 44 Ohio St.3d 128,130. In doing so, the trial court is necessarily vested with wide discretion in formulating an equitable distribution of such property. Id.; Berish v. Berish (1982), 69 Ohio St.2d 318, 319. The trial court's discretion is broad, but not unlimited. Biskerv. Bisker (1994), 69 Ohio St.3d 608, 609.
 As an initial matter, the trial court is charged with the duty of classifying all property of the parties as either marital property or separate property. R.C. 3105.171(B). The statute provides definitions for "marital property" and "separate property" in R.C. 3105.171(A)(3) and (A)(6), respectively. These statutory terms are mutually exclusive in that marital property "does not include any separate property." R.C. 3105.171(A)(3)(b).
The trial court's characterization of property as either marital or separate necessarily involves a factual inquiry. As a result, an appellate court must apply a manifest weight of the evidence standard of review to the trial court's determination of whether a given asset constituted marital or separate property.Barkley v. Barkley (1997), 119 Ohio App.3d 155, 159. See, also,Dunlap v. Dunlap (Sept. 28, 1984), Warren App. No. CA83-09-063, unreported, at 3, 1984 WL 3431. Under this standard, the judgment of the trial court will not be reversed as being against the weight of the evidence if the court's decision is supported by competent, credible evidence. Sec. Pacific Natl. Bank v. Roulette
(1986), 24 Ohio St.3d 17, 20; Seasons Coal Co., Inc. v. Cleveland
(1984), 10 Ohio St.3d 77, 80; C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus.
After carrying out its duty to classify all spousal assets, the trial court can turn to the task of dividing and distributing the marital and separate property of the parties. As a general matter, the division of marital property is required to be equal. R.C.3105.171(C)(1). If an equal division of marital property would be inequitable, however, the trial court must divide the marital property in a manner that it deems equitable. Id.
The trial court's division of marital property will not be disturbed on appeal unless the court abused its discretion. Boothv. Booth (1989), 44 Ohio St.3d 142, 144; Martin v. Martin (1985),18 Ohio St.3d 292, 294. An abuse of discretion connotes more than a mere error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
With regard to separate property, the general rule is that the trial court must disburse such property to the spouse who acquired any interest therein prior to the date of the marriage. R.C.3105.171(D). If the trial court does not allocate a spouse's separate property to that spouse, the court must make written findings of fact that explain the factors that it considered in arriving at that distribution. Id. The trial court, however, still retains the right to make a distributive award from a spouse's separate property. See R.C. 3105.171(E).
In the case sub judice, the question presented by the first assignment of error is whether the residence at 248 Ashgrove constituted marital property, separate property, or a combination thereof. The trial court adjudged 248 Ashgrove to be entirely marital property. Consequently, the trial court ordered the property to be sold and the proceeds divided evenly between the parties, subject only to appellant's right to purchase appellee's one-half equitable interest in the residence.
Marital property includes all real and personal property that is currently owned by either or both of the spouses and that was acquired by either or both of the spouses during the marriage. R.C. 3105.171(A)(3)(a)(i). Property acquired during the marriage is presumed to be marital unless it can be shown to be separate.Kampf v. Kampf (May 3, 1991), Ashtabula App. No. 90-A-1503, unreported, at 3, 1991 WL 70785; see, also, Croftcheck v. Croftcheck
(Aug. 29, 1996), Cuyahoga App. No. 68140, unreported, at 1, 1996 WL 492261.
In its simplest terms, separate property includes all real and personal property that was acquired by one spouse prior to themarriage. R.C. 3105.171(A)(6)(a)(ii). The statute actually sets forth seven types of separate property. Among the categories are the following:
 "(6)(a) `Separate property' means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:
"* * *
 "(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
 "(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage[.]"
The burden of proving that property is separate under R.C.3105.171 is upon the proponent of the claim. Peck v.Peck (1994), 96 Ohio App.3d 731, 734; Horning v.Horning (Oct. 8, 1999), Portage App. No. 98-P-0082, unreported, at 11, 1999 Ohio App. LEXIS 4798; Balogh v.Balogh (Dec. 29, 1995), Portage App. No. 94-P-0099, unreported, at 3, 1995 WL 815504; Kane v. Kane (Dec. 15, 1995), Lake App. No. 94-L-169, unreported, at 3, 1995 WL 869955. The proponent must establish the separate nature of the property by a preponderance of the evidence. Peck, 96 Ohio App.3d at 734; Horning, 1999 Ohio App. LEXIS 4798, at 11; Letson v. Letson (Sept. 30, 1997), Trumbull App. No. 95-T-5356, unreported, at 3, 1997 WL 663514.
In this case, appellant satisfied his burden of proving that a portion of the value of 248 Ashgrove was his separate property. Hence, the trial court's exclusive classification of 248 Ashgrove as marital property was in error.
To explain how we arrive at this conclusion, it is necessary to begin our analysis with the parties' first marital residence at 214 Solon. As recounted previously, appellant clearly owned the real property comprising both 212 Solon and 214 Solon prior to his marriage to appellee in December 1976. After the parties' marriage, appellant sold 212 Solon and realized net proceeds of $35,954. It was undisputed that this money was applied entirely toward the construction of the house on 214 Solon, while the balance was funded through a bank mortgage. When the $35,954 was coupled with the $20,000 approximate value for the lot at 214 Solon, it is apparent that appellant contributed $55,954 in separate property to what would become the parties' marital residence from 1977 until 1994. In other words, $55,954 of the initial funds used to construct 214 Solon in 1977 were traceable to appellant as premarital separate property.
In her brief, appellee acknowledges that the real property at 214 Solon was initially appellant's separate property at the time of their marriage. Appellee, however, maintains that it became marital property shortly thereafter when the parties built their first house because appellant gave her a one-half interest in 214 Solon as a gift. If so, then 248 Ashgrove would be marital property, even if its construction was financed in part by the proceeds derived from the sale of 214 Solon.
As a general matter, a spouse can change separate property into marital property through his or her actions during the course of the marriage. Helton v. Helton (1996), 114 Ohio App.3d 683, 685, citing Moore v. Moore (1992), 83 Ohio App.3d 75, 77. Perhaps the most commonly recognized method of effectuating such a metamorphosis of separate property into marital property is through an inter vivos
gift. Barkley, 119 Ohio App.3d at 160; Helton,114 Ohio App.3d at 685. An inter vivos gift occurs when the donor executes "an immediate voluntary, gratuitous and irrevocable transfer of property" to the donee. Smith v. Shafer (1993), 89 Ohio App.3d 181, 183.
The essential elements of an inter vivos gift are as follows: (1) the intent of the donor to make an immediate gift; (2) the delivery of the property to the donee; and (3) the acceptance of the gift by the donee after the donor has relinquished control of the property. George v. Zink (May 23, 1997), Lake App. No. 96-L-132, unreported, at 2, 1997 WL 286204, citing Streeper v.Myers (1937), 132 Ohio St. 322, paragraph one of the syllabus. See, also, Bolles v. Toledo Trust Co. (1936), 132 Ohio St. 21, paragraph one of the syllabus; Barkley, 119 Ohio App.3d at 161, fn. 2. If any of these elements is not satisfied, the gift as a whole fails. George, 1997 WL 286204, at 2, citing Bolles,132 Ohio St. at 30-31.
The donee bears the burden of proving by clear and convincing evidence that the donor made an inter vivos gift. In re Estate ofFife (1956), 164 Ohio St. 449, 456. See, also, In re Guardianshipof Marshall (May 26, 1998), Butler App. Nos. CA96-11-239 and CA96-11-244, unreported, at 6, 1998 Ohio App. LEXIS 2275. In the divorce context, the donee spouse must demonstrate the gift of the real or personal property by clear and convincing evidence in order to have the donor spouse's otherwise separate property classified as a marital asset. See, e.g., Helton,114 Ohio App.3d at 686-687.
In the instant matter, appellee claims that she was the recipient of a gift from appellant. Consequently, she bore the burden of proof regarding the existence of the alleged gift given her status as the donee spouse.
Appellee essentially takes the position that appellant intended to give a one-half interest in 214 Solon to her as a gift in 1977 shortly after the couple was married. This purported gift of an equal interest in 214 Solon subsequently gave rise to her claimed one-half ownership of 248 Ashgrove years later.
Despite her present claim in this appeal that one-half of 214 Solon was gifted to her, appellee presented no real evidence to this effect during the proceedings below. Appellee never testified on either direct or cross-examination that appellant intended to bestow a gift upon her when he subdivided the 212 Solon property into two smaller lots, including the new tract of land designated as 214 Solon.
Because she herself did not provide any testimonial or documentary evidence regarding the alleged gift, appellee now attempts to argue that the required donative intent was established by appellant's testimony during the divorce proceedings. In support of this, appellee points to the following exchange that her counsel had with appellant on cross-examination:
 "Q. Was it your intent, evidenced by this deed, to transfer the property at 214 [Solon] into yours and your wife's name?
 "A. The intent was to transfer that property so we could build a home at 214 Solon Road.
 "Q. Okay. `We' meaning you and your wife to build a marital residence?
 "A. We were married at that time, yes, and build a marital property."
Appellee places undue emphasis on the fact that appellant happened to use the term "marital property" in his response to the question. Obviously, that phrase is a statutory term of art in the field of domestic relations law. There is, however, nothing in appellant's answer to the query or its surrounding context to suggest that he was employing the term in its legal sense. Rather, appellant was simply stating that he and his wife intended to build a marital residence in which to live at the time he subdivided his property into 212 Solon and 214 Solon. No one disputes the fact that the parties used the proceeds from the sale of the former to build a house on the latter, which is where they ultimately lived for seventeen years.
Upon review, it is apparent that appellant's testimony did not evidence a donative intent. The testimony that appellee relies upon is hardly evidence of an intent on appellant's part to bestow a gift.
Moreover, it should be pointed out that the trial court obviously did not deem the subdivision of appellant's property into 212 Solon and 214 Solon as constituting a gift. In the divorce decree, the trial court observed that appellant used $55,954 in premarital funds ($35,954 in net proceeds from the sale of 212 Solon) and assets ($20,000 approximate value of the lot at 214 Solon) to build the first marital residence at 214 Solon. The trial court never made a finding that appellant intended to give a one-half interest in 214 Solon to appellee as a gift.
Because appellee did not prove the first element of a validinter vivos gift, there is no need to analyze the remaining two criteria. The trial court correctly concluded that $55,954 of the initial equity in 214 Solon was traceable to appellant as separate property. This leads to the second step in the analysis, to wit: the 1994 sale of 214 Solon and purchase of 248 Ashgrove.
The trial court concluded that 248 Ashgrove was marital property for two reasons: (1) none of the sale proceeds from 214 Solon were used for the purchase of 248 Ashgrove; and (2) the deed and bank mortgage pertaining to 248 Ashgrove were in both parties' names. We will consider these reasons in reverse order.
The fact that the deed to 248 Ashgrove and the bank mortgage on the property were in both parties' names is not dispositive of whether the residence should be classified as marital or separate property. In this regard, R.C. 3105.171(H) explicitly states in part:
 "[T]he holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital property or separate property."
Under prior case law, the presence of both parties' names on a joint title may have given rise to the presumption that appellant had foregone whatever separate interest he had in the property by gifting fifty percent of it to appellee as marital property. Since the enactment of R.C. 3105.171, however, the presumption of a gift has been negated. Gest v. Gest (Apr. 29, 1998), Lorain App. No. 96CA006580, unreported, at 16, 1998 Ohio App. LEXIS 1798;Barkley, 119 Ohio App.3d at 161. Rather, a trial court may make such a finding only upon an appropriate factual context. Weber v. Weber
(June 30, 1999), Medina App. No. 2846-M, unreported, at 9, 1999 Ohio App. LEXIS 3113.
In other words, title to property in and of itself does not determine whether property is marital or separate. Instead, title is only one factor that is relevant to, but not conclusive of, the classification of property. Barkley, 119 Ohio App.3d at 161. Indeed, property titled jointly in both parties' names may ultimately be determined to be separate. See, e.g., Bower v.Bower (Mar. 3, 1995), Sandusky App. No. 5-94-14, unreported, 1995 Ohio App. LEXIS 842; Irwin v. Irwin (May 11, 1993), Green App. No. 92-CA-54, unreported, 1993 Ohio App. LEXIS 2469; Baker v. Baker
(Feb. 10, 1993), Meigs App. No. 477, unreported, 1993 Ohio App. LEXIS 783.
In the present case, there was no evidence to suggest nor did the trial court find that appellant had relinquished by gift to appellee any separate interest that he may have had in 248 Ashgrove. Thus, the trial court was compelled to look beyond the fact that the title to 248 Ashgrove was in the parties' joint names.
 In characterizing all of the equity in 248 Ashgrove as a marital asset, the trial court also ostensibly relied on its factual finding that none of the sale proceeds from 214 Solon were used for the purchase of 248 Ashgrove. In her brief, appellee picks up on this theme by contending that even if 214 Solon was appellant's separate property, the proceeds from its sale were transmuted into marital property when such proceeds were commingled with other marital funds. Appellee, in other words, invokes the concept of transmutation to support the trial court's judgment.
Transmutation is the process by which property that would otherwise be separate is converted into marital property. Under prior case law, the trial court, within its sound discretion, could consider multiple factors when assessing an alleged transmutation of property. These factors included: (1) the expressed intent of the parties insofar as it could be reliably ascertained; (2) the source of the funds, if any, used to acquire the property; (3) the circumstances surrounding the acquisition of the property; (4) the dates of the marriage, the acquisition of the property, the claimed transmutation, and the breakup of the marriage; (5) the inducement for and/or purpose of the transaction which gave rise to the claimed transmutation; and (6) the value of the property and its significance to the parties. See, e.g., Kuehn v.Kuehn (1988), 55 Ohio App.3d 245, 246.
When R.C. 3105.171 became effective on January 1, 1991, however, the doctrine of transmutation was effectively supplanted by the concept of traceability, or the "source of funds" rule. The latter is embodied by R.C. 3105.171(A)(6)(b), which provides:
 "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable."
The act of commingling is no longer determinative. Instead, the traceability of separate property is the paramount concern.Balogh, 1995 WL 815504, at 3. In enacting R.C. 3105.171, the General Assembly was codifying the view that if the right to hold separate property is to be meaningful, then the classification of property as marital or nonmarital must be determined by the source of contributions. Morgan v. Morgan (June 11, 1993), Portage App. No. 92-P-0084, unreported, at 2, 1993 WL 418495, citing Kahn v. Kahn
(1987), 42 Ohio App.3d 61, 65-66. Therefore, the only scenario by which transmutation may still occur under the current provisions of R.C. 3105.171 is a situation wherein a spouse is not able to trace his or her separate property. See Letson, 1997 WL 663514, at 4 (wherein this court held that "it is error to solely rely on the doctrine of transmutation without addressing the traceability of funds").
In the case at bar, appellant contributed an initial sum of $55,924 in separate property to the parties' original marital residence at 214 Solon. Appellant retained this interest throughout the marriage. Appellee now contends that none of the proceeds from the sale of 214 Solon were used to purchase 248 Ashgrove, and the trial court apparently agreed with her position. Upon review, however, we disagree.
As described previously, the parties decided to buy 248 Ashgrove in March 1994. In order to help finance the purchase, the parties took out the aforementioned $46,826.07 home equity loan based on the equity built up in 214 Solon. The proceeds from this home equity loan were used as the down payment on the $236,000 purchase price of 248 Ashgrove.
Appellee argues that none of the $236,000 was directly paid for by funds from the sale of 214 Solon. This is true for the simple reason that the parties consummated the purchase of 248 Ashgrove in March 1994, but they did not finalize the sale of 214 Solon until July 1994. As such, there were not yet funds available from 214 Solon when the parties bought 248 Ashgrove.
The parties sold the residence at 214 Solon for $134,000 in July 1994 only after acquiring 248 Ashgrove. Based on the joint trial stipulations filed by the parties, some of the sale proceeds were used to pay off the $46,826.07 home equity loan that had previously been used as the down payment on 248 Ashgrove.[7]
These sale proceeds can be traced back to 214 Solon; therefore, the trial court had a duty to calculate how much of the $46,826.07 was appellant's separate property.
Moreover, it is also uncontroverted that $53,116 of the net proceeds from the sale of 214 Solon were deposited into a joint credit union checking account maintained by the parties. A portion of the $53,116 was subsequently used to finish the construction of the residence on 248 Ashgrove. The trial court had a duty to calculate what percentage of the $53,116 could be traced directly back to the sale of 214 Solon as appellant's separate property.
Appellant's first assignment is well-taken. Based on our review, we conclude that the trial court's characterization of 248 Ashgrove as marital property was contrary to the manifest weight of the evidence. The trial court's finding to the effect that none of the proceeds from the sale of 214 Solon were used to purchase 248 Ashgrove was not supported by competent, credible evidence.
The decision of the trial court in this respect must be reversed. On remand, the trial court is instructed to determine what percentage of the value of 248 Ashgrove can be traced back to the original $55,924 that appellant brought to the marriage in the form of the prior marital residence at 214 Solon. In doing so, the trial court must take into account any appreciation in the fair market value of 214 Solon from 1977 through 1994 and any appreciation in the fair market value of 248 Ashgrove from 1994 until the present because it may represent "[p]assive income and appreciation acquired from separate property by one spouse during the marriage" pursuant to R.C.3105.171(A)(6)(a)(iii).
On a final note, we would remind the parties and the trial court that any resulting inequitable separate property award is not etched in stone. The trial court ultimately retains the discretion to balance any inequitable property division with a distributive award to appellee from appellant's separate property interest in 248 Ashgrove.
 II.
In his second assignment of error, appellant contends that the trial court erred by finding certain real property located at 261 Center Road in Bedford, Ohio to be marital property subject to division and distribution. According to appellant, the tract of land should have been deemed to be his separate property.
The record shows that the parties purchased a one-half interest in the lot at 261 Center in 1981. The other half of the property was bought at the same time by another married couple with whom the Fredericks were friends. The respective one-half interests in 261 Center were titled in the wives' names. According to the testimony at trial, this was done because both husbands were police officers with the Bedford Police Department at the time the lot was purchased. The Fredericks and the co-owners of 261 Center wanted to have the property rezoned for a different use. It was agreed that it would be better to title the property in the wives' names in order to avoid any suggestion that the police officers were using their positions in the community to pressure the local zoning board into changing the zoning of 261 Center.
In the divorce decree, the trial court disposed of this asset in the following manner:
 "The parties have an undivided one-half interest in the property known as 261 Center Road, Bedford, Ohio and Wife shall be entitled to receive her interest in said property which the Court determines to be 25 percent of the fair market value set at $27,000 (her interest is $6,750)."[8]
Although the trial court did not expressly classify 261 Center as marital property, it appears that the court treated it as such. Based on the fair market value of $27,000, the parties' one-half interest in the real estate was $13,500. The trial court then split this amount evenly by giving each spouse a $6,750 interest in 261 Center.
On appeal, appellant maintains that 261 Center was actually his separate property because the funds used to purchase the lot came directly from the sale of an automobile that appellant owned prior to the marriage. Specifically, appellant testified at trial that he purchased a 1976 vehicle before he married appellee in December of that year. He then sold the car in 1981 and used the proceeds to pay one-half of the $12,000 total purchase price for 261 Center.
Appellee acknowledged that appellant did own the automobile in question when the parties entered into the marriage, but she did not know when appellant sold the vehicle. Beyond this, appellee testified that she did not know the source of funds used to purchase 261 Center. Appellee asserts, however, that appellant's counsel actually agreed to an oral stipulation at trial to the effect that 261 Center was a marital asset.
A review of the transcript reveals that there was confusion over whether appellant's counsel stipulated to the fact that 261 Center was marital property. The trial court appears to have been under the impression that appellant's attorney did indeed stipulate to the characterization of the property as being marital in nature. The transcript of the trial proceedings, however, demonstrates that counsel for appellant did not really agree to this classification.
If the trial court relied on the alleged oral stipulation when dividing 261 Center as marital property, it would have been error given our conclusion that the classification of this particular asset was not validly stipulated to by both parties. It is possible, however, that the trial court did not believe and found no corroboration for appellant's testimony that the money used to purchase 261 Center came directly from the sale of his premarital automobile. We are unable to ascertain the extent to which the trial court may have relied on the stipulation, as opposed to a credibility assessment of appellant's testimony. Therefore, we must reverse this aspect of the divorce decree. On remand, the trial court is instructed to issue express findings with respect to appellant's position that the money used to purchase 261 Center was traceable as separate property. The second assignment has merit, but only to the extent indicated.
 III.
In his third assignment of error, appellant argues that the trial court erred in allocating certain automobiles as marital property. According to appellant, a portion of the equity accrued in these automobiles should have been designated as the separate property of a business that he co-owns.
At trial, the parties stipulated as to the existence and fair market value of four automobiles: (1) a 1995 Monte Carlo; (2) a 1997 Chevy Lumina; (3) a 1995 Buick Riviera; and (4) a 1992 Mercury Topaz. It was also stipulated that appellant was the sole title owner of the vehicles. All of these cars were acquired during the parties' marriage.
The trial court awarded the 1995 Monte Carlo to appellee, while the three remaining automobiles were distributed to appellant. Again, the trial court disbursed these assets without specifically categorizing them as marital or separate property. It would appear, however, that the trial court determined that the vehicles fell within the marital estate.
On appeal, appellant postulates that the 1995 Monte Carlo, the 1997 Chevy Lumina, and the 1995 Buick Riviera were actually co-owned by a company that he formed with his brother called D B Immobilization, Inc. Appellant owns fifty percent of this company. According to appellant, the trial court should have evenly apportioned the equity in these three cars between marital and nonmarital property because D B Immobilization actually contributed a significant percentage of their respective purchase prices.
We disagree. The Ohio Certificate of Title Act specifically deals with instruments evidencing title and ownership of motor vehicles. R.C. 4505.04 provides in part:
 "(A) No person acquiring a motor vehicle from its owner, whether the owner is a manufacturer, importer, dealer, or any other person, shall acquire any right, title, claim, or interest in or to the motor vehicle until there is issued to the person a certificate of title to the motor vehicle, or delivered to the person a manufacturer's or importer's certificate for it * * *.
 "(B) * * * no court shall recognize the right, title, claim, or interest of any person in or to any motor vehicle sold or disposed of, or mortgaged or encumbered, unless evidenced:
 "(1) By a certificate of title, a manufacturer's or importer's certificate * * *;
 "(2) By admission in the pleadings or stipulation of the parties[.]"
As stated previously, appellant was the sole title owner of the vehicles. D B Immobilization did not appear as a co-owner on any of the certificates of title. Appellant acknowledges the relevancy of R.C. 4505.04 with regard to the disposition of the three automobiles. He asserts, however, that ownership of a motor vehicle may be demonstrated by other means besides a certificate of title.
In support of this position, appellant cites State v. Shimits
(1984), 10 Ohio St.3d 83. In Shimits, the Supreme Court of Ohio held that evidence, other than a certificate of title, offered by a non-titleholder is admissible to establish an equitable ownership interest in an automobile. The court, however, rendered this holding in the context of deciding whether a third party non-titleholder could be an "innocent owner" of a vehicle in a forfeiture proceeding. The court concluded that R.C. 4505.04 should not be construed as effectively depriving an equitable owner of his or her interest in a vehicle when that vehicle may be forfeited to the state. Shimits,10 Ohio St.3d at 85.
The Shimits decision is context specific and has no application to the case at bar. By contrast, R.C. 4505.04 applies to civil cases wherein two or more parties are contesting ownership interests in a motor vehicle. Hoegler v. Hamper (1992), 79 Ohio App.3d 280,283, citing State v. Rhodes (1982), 2 Ohio St.3d 74, 75
("Essentially, R.C. 4505.04 has been construed by this court to apply in civil cases wherein parties were asserting rival or competing interests pertaining to a motor vehicle."). Indeed, the Supreme Court of Ohio has expressly noted that R.C. 4505.04 is triggered in actions involving "instruments evidencing title and ownership." Smith v.Nationwide Mut. Ins. Co. (1988), 37 Ohio St.3d 150, 153.
When a party outside the marital relationship is claiming an ownership interest in a motor vehicle, the provisions of R.C.4505.04 govern the dispute. Pursuant to the statute, appellant was conclusively presumed to be the owner of the three cars, whereas D B Immobilization had no interest based on the titles.
Because the automobiles were acquired during the course of the parties' marriage, they constituted marital property pursuant to R.C. 3105.171. As such, the trial court did not err in distributing them accordingly. The third assignment is not well-taken.
 IV.
In his fourth assignment of error, appellant proposes that the trial court abused its discretion by finding that certain debts incurred by appellee between the filing of the divorce complaint and the final hearing constituted marital debt. According to appellant, the burden of repaying these debts should have been borne exclusively by appellee.
As indicated previously, appellee filed for divorce on September 5, 1997. Thereafter, the evidence at trial showed that she incurred the following debts: (1) $3,691 on a KeyBank Visa card, which account was opened on September 5, 1997; (2) a $3,000 KeyBank loan received on October 3, 1997, which proceeds were deposited into her KeyBank checking account; and (3) $4,851 on a Household Bank Mastercard, which account was opened in February 1998.
The trial court disposed of these debts in this manner:
 "The Key Bank loan ($3,000), the Key Bank Visa ($3,691), and the Household Mastercard ($4,851) are found to be marital debts. Dividing the marital debts in approximate proportion to the parties' income (Husband $55,000 and Wife $18,000), Husband shall pay the Key Bank Visa and the Household Mastercard and Wife shall pay the Key Bank loan."
There was copious evidence introduced at trial to document what purchases appellee made with the two credit cards and the money from the bank loan. This evidence took the form of appellee's testimony and copies of credit card statements and checkbook registers. The purchases are too numerous to detail, but they included such expenses as clothing, groceries, gasoline, furniture, restaurants, hotels, and Christmas gifts.
Appellant takes the position on appeal that all of these liabilities should be paid by appellee. In support of this, appellant points out that he was commanded to pay temporary spousal support ($450 per month) and child support ($375.60 per child per month) pending litigation. The temporary support obligation commenced in October 1997 and continued through the final hearing. Obviously, such money was designated for support purposes. From appellant's perspective, it was inequitable for the trial court to impose any portion of the aforementioned debts on him in light of the fact that appellee was already receiving the benefit of significant spousal and child support payments.
The trial court was under an obligation to divide the marital property equitably between appellant and appellee. R.C. 3105.171(B) and (C)(1). This marital property consisted of all real and personal property owned by either appellant or appellee and that was acquired by either or both of them during the marriage. R.C.3105.171(A)(3)(a)(i). In addition to distributing marital assets, the trial court had a concomitant duty to apportion any marital debts incurred by the parties during the marriage.
The concept of "during the marriage" requires the trial court to address the question of when the marriage began and ended. Explicit beginning and ending dates are crucial in distinguishing between marital and nonmarital assets and liabilities. The phrase "during the marriage" is statutorily presumed to run from the date of the marriage through the date of the final divorce hearing. R.C. 3105.171(A)(2)(a). If, however, the trial court determines that the use of either or both of these dates would be inequitable, then "the court may select dates that it considers equitable in determining marital property." R.C. 3105.171(A)(2)(b).
With regard to the KeyBank and Household Bank debts incurred by appellee, the trial court chose to treat them as marital debts based on its implicit conclusion that the final divorce hearing should be used as the end date for purposes of valuing marital assets and liabilities. Appellant maintains that a more equitable outcome would have been achieved if the trial court had used the de facto termination date of the marriage. In this regard, appellant suggests that a more appropriate date for classifying the marital debts would have been either September 5, 1997 (the date appellee filed the divorce complaint) or November 1, 1999 (the date that the parties officially separated).
Upon review, we conclude that the trial court did not abuse its discretion in this regard. Pursuant to R.C. 3105.171(A)(2), the trial court had wide discretion in selecting a termination date for purposes of classifying marital debt that should be borne jointly by both parties. After hearing what purchases appellee made with the credit cards and bank loan proceeds, the trial court found it appropriate to deem the debts as marital in nature. We can not say that this amounted to an abuse of discretion. The fourth assignment is meritless.
 V.
In his fifth assignment of error, appellant claims that the trial court erred by treating certain pension benefits as both marital property subject to division and as income for spousal and child support purposes. According to appellant, such benefits should have been designated exclusively as marital assets for purposes of property division.
Pursuant to this proposed error, appellant advances two distinct issues. He first maintains that the classification of a pension asset as both marital property and income for support purposes results in a manifest injustice to the payor spouse. Appellant then essentially argues in the alternative that if his share of the pension benefits is viewed as income for support purposes, it is unfair not to similarly classify appellee's portion as income when awarding spousal and child support.
At trial, it was established that appellant had vested pension benefits with the Police and Firemen's Disability and Pension Fund ("PFDPF"). See R.C. Chapter 742. The benefits were mature because appellant was receiving payments under the plan.
With respect to the PFDPF benefits, the trial court decreed in part:
 "Husband has a Police and Fireman's pension currently in payout status providing Husband $2,467 a month. Of that amount, $1,331.94 was earned during the marriage and Husband shall assign one-half of said funds [$665.97] to Wife and each shall be responsible for the taxes on said payments."
Pension and other retirement benefits acquired by either spouse during a marriage are marital property subject to equitable division upon divorce. R.C. 3105.171(A)(3)(a)(i). See, also,Erb v. Erb (1996), 75 Ohio St.3d 18, 20; Hoyt v. Hoyt (1990),53 Ohio St.3d 177, 178; Holcomb, 44 Ohio St.3d 128, at syllabus. When distributing such benefits, the trial court must consider "the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension or retirement plan, and the reasonableness of the result." Erb, 75 Ohio St.3d at 20, citing Hoyt,53 Ohio St.3d at 179.
The trial court is necessarily vested with wide discretion in formulating an equitable distribution of marital property, including retirement benefits. On appeal, appellant challenges neither the net amount of the monthly benefit payment from PFDPF nor the equal apportionment of such benefits between the parties. Indeed, appellant concedes that the benefits were marital property subject to division pursuant to R.C. 3105.171(A)(3)(a).
After acknowledging the benefits' status as marital property, however, appellant takes issue with the trial court's imputation of such benefits as income earned by him for purposes of calculating his spousal and child support obligations. Appellant argues that there is no legal basis for treating pension benefits as both marital property and as income.
In support of this contention, appellant strenuously expounds on the theory of "double dipping," to wit: when a marital pension is divided as part of the property distribution and is subsequently included as income for purposes of establishing the support obligations of the payor spouse, the payee spouse receives a portion of that pension in two different forms. See Baldwin's Ohio Domestic Relations Law (1997), Section 13.15, at 553-554. From appellant's perspective, this amounts to double dipping because the payee spouse is initially awarded a portion of the payor spouse's pension benefits in the property division; subsequently, the payee spouse receives a percentage of such benefits retained by the payor spouse in the form of spousal and/or child support.
Initially, we must address whether the trial court erred by considering the PFDPF benefits retained by appellant as income for purposes of determining whether spousal support was appropriate in the instant case. While appellant rails against such double dipping, he nonetheless acknowledges the applicability of R.C.3105.18. This statute governs the awarding of spousal support in Ohio. It reads in relevant part:
 "(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
"* * *
"(d) The retirement benefits of the parties[.]"
R.C. 3105.18(C)(1)(a) clearly commands the trial court to take into account any income derived from property divided under R.C.3105.171 when the court is "determining whether spousal support is appropriate and reasonable[.]" This would encompass income derived (e.g., appellant's pension benefits) from property (e.g., the PFDPF pension itself) which was previously disbursed by the trial court in the division of property. Under R.C. 3105.18(C)(1)(a), "income from a pension, even if that pension has been divided between the parties by a QDRO or otherwise, should be considered by the court in determining the reasonableness and appropriateness of an award of spousal support." Baldwin's Domestic Relations Law, supra, Section 13.9, at 545-546. Moreover, R.C. 3105.18(C)(1)(d) expressly mandates that the trial court consider retirement benefits, such as pension payments, when it is adjudicating the question of spousal support.
Thus, a payee spouse can receive some portion of the payor spouse's pension in the division of marital property and then subsequently receive even more of the pension pay-out via an award of spousal support that is based, at least in part, on the pension benefits retained by the payor spouse. Briskey v. Briskey (July 23, 1998), Cuyahoga App. No. 73368, unreported, at 3, 1998 WL 414926 (holding that "when a court awards spousal support under R.C. 3105.18, a trial court must consider income in the form of retirements benefits, even if they already were distributed as marital property under R.C. 3105.171"); Enix v. Enix (Feb. 4, 1993), Montgomery App. No. 13535, unreported, at 2, 1993 WL 26775. Although the payee spouse obviously may receive multiple forms of compensation from the same source of funds, the General Assembly has specifically authorized such an outcome by enacting R.C.3105.18(C)(1)(a) and (d).
In a similar vein, the trial court could include the PFDPF benefits retained by appellant as gross income when calculating his child support obligation as mandated by statute. R.C. 3113.215
governs the calculation of child support orders in Ohio. It states in part:
"(A) As used in this section:
"* * *
 "(2) `Gross income' means, except as excluded in this division, the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes, but is not limited to, income from salaries, wages, overtime pay and bonuses * * *, commissions, royalties, tips, rents, dividends, severance pay, pensions, interest, trust income, annuities, social security benefits, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, * * * and all other sources of income * * *." (Emphasis added.)
Gross income as defined by R.C. 3113.215(A)(2) and used in the context of the child support worksheet includes all income derived from pensions. This obviously encompasses appellant's PFDPF benefits.
Hence, the trial court did not err by treating his pension benefits as both marital property subject to division and as income for spousal and child support purposes. Indeed, the trial court was statutorily authorized to do so.
Although not separately assigned as error, appellant's second and alternative argument under this assignment is more compelling. Specifically, appellant proposes that the trial court should have considered appellee's receipt of her proportionate share of PFDPF benefits as income for support purposes.
In the divorce decree, the trial court ordered appellant to pay $1200 plus poundage in monthly spousal support for a period of five years or until appellee remarried or died. Because the parties' one remaining minor child resides primarily with appellee, the trial court further ordered that appellant pay his former wife $561 per month plus poundage in child support. The question presented is whether the trial court erred by not including the portion of appellant's pension that appellee is receiving in her income for purposes of awarding of spousal support and calculating child support.
As indicated earlier, the trial court decreed that one-half of the $1,331.94 that appellant received each month in PFDPF benefits would thereafter be assigned to appellee as marital property. This amounted to $665.97 in monthly income, or $7,991.64 annually, for appellee.
A review of the record demonstrates that the trial court did not include this amount in appellee's income when calculating appellant's monthly child support obligation. The trial court attached the required child support worksheet to the divorce decree. This worksheet reveals that the trial court listed appellee's annual gross income from employment as $18,346. This was apparently based upon appellee's testimony at trial that she was currently making $9 per hour at a forty-hour per week job. The $18,346 figure clearly could not include the $7,991.64 from appellant's PFDPF benefits that appellee was due to receive annually following the divorce. The trial court, therefore, erred by failing to include that portion of appellant's pension which appellee is scheduled to receive in her income for purposes of the child support calculation under R.C. 3113.215.
While there is a child support worksheet showing what gross income the trial court used in reference to appellee, the Revised Code does not require that any such corresponding worksheet be used in the context of spousal support. Despite this, the record strongly suggests that the trial court employed a similar figure of approximately $18,000 as appellee's annual income when determining whether spousal support was appropriate and reasonable.[9] When making this determination, R.C.3105.18(C)(1)(a) explicitly requires the trial court to consider the income of both parties from all sources, including, but not limited to, income derived from property divided under R.C. 3105.171. The trial court, consequently, erred by not including the amount of appellant's PFDPF benefits that appellee receives every month as income for purposes of adjudging whether spousal support was appropriate in this case, and if so, the amount of such support.
In conclusion, the trial court did not err by designating appellant's pension benefits for division as marital property and subsequently viewing the receipt of such benefits by appellant as income for spousal and child support purposes. The trial court, though, did err by failing to take into account the fact that appellee also derived income from the receipt of such benefits. The fifth assignment is well-taken to the extent indicated.
 VI.
In his sixth assignment of error, appellant proposes that the trial court erred when calculating child support by failing to take into consideration the amount of money he expends in providing health insurance for the parties' minor son. Appellant asks this court to reverse the trial court's child support order based on this alleged oversight.
Pursuant to R.C. 3113.215(B)(1), in "any action in which a child support order is issued * * * the court or agency shall calculate the amount of the obligor's child support obligation in accordance with the basic child support schedule in division (D) of this section, the applicable worksheet in division (E) or (F) of this section, and the other provisions of this section * * *." In the case sub judice, the trial court calculated appellant's child support obligation by using the applicable worksheet set forth in R.C. 3113.215(E).
Line 19 of this worksheet requires the trial court to list each party's "[m]arginal, out-of-pocket costs, necessary to provide for health insurance for the children who are the subject of this order." This amount is then deducted from each parent's annual support obligation. A review of the child support worksheet reveals that the trial court did not give credit to either party for any out-of-pocket health insurance costs.
Appellant now claims that the trial court erred by not adjusting the actual dollar amount of his annual child support obligation downward in light of the costs he incurs in providing health insurance for his son. According to appellant, the child is covered by his family health insurance policy through the PFDPF for which appellant pays a monthly premium of $100. While not disputing this, appellee maintains that the trial court did not err because appellant did not offer any evidence regarding what portion of the $100 monthly premium is specifically attributable to the policy's inclusion of the boy as an insured family member.
Upon review, we agree with appellee. Appellant does not point to any evidence in the record wherein he demonstrated the marginal cost necessary to provide health insurance for the parties' minor son. Moreover, appellant fails to cite with specificity what testimony or documentary evidence was introduced regarding his costs for health insurance. The sixth assignment lacks merit.
 VII.
In his seventh assignment of error, appellant posits that the trial court abused its discretion when it distributed his Public Employees Retirement System (PERS) pension. Specifically, appellant challenges the trial court's order awarding a one-half interest in the PERS pension to appellee in the form of a lump sum distribution from the equity accrued in the marital residence at 248 Ashgrove.
At trial, the parties stipulated as to the existence of appellant's PERS pension. In the stipulation, the parties also agreed that appellant would be entitled to either a certain monthly payment or a lump sum distribution from PERS upon attaining sixty-five years of age in the year 2010. It was uncontroverted that the present value of the pension at the time of trial was approximately $16,357.94. All of this amount constituted marital property because appellant had earned these pension funds during the course of the marriage.
The trial court forgot to address appellant's PERS pension in the original divorce decree. Appellee raised this fact in her Civ.R. 59 motion for a new trial which resulted in the trial court issuing the February 2, 1999 supplemental judgment entry as an addendum to the prior divorce decree. In this entry, the trial court disposed of the PERS pension in the following manner:
 "Defendant's interest in the Public Employees Retirement System Pension ($16,357.94.) shall be divided equally between the parties. Plaintiff shall be given her interest in the plan ($8,178.97) at the time of the sale of the marital residence or if Defendant elects, at the time that Defendant purchases Plaintiff's interest in the marital residence."
On appeal, appellant does not take issue with the trial court's equal division of the PERS pension between the parties. Rather, appellant contends that the trial court abused its discretion by ordering the immediate distribution of $8,178.97 to appellee. From appellant's perspective, it is inequitable for appellee to garner her one-half interest right away, while appellant has to wait until 2010 to receive his benefits from PERS.
As stated previously, pension and other retirement benefits acquired by either spouse during the course of a marriage are marital property subject to equitable division upon divorce. The Supreme Court of Ohio has counseled lower courts to consider the following factors when distributing such benefits: the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension or retirement plan, and the reasonableness of the result. Hoyt, 53 Ohio St.3d at 179; see, also, Erb, 75 Ohio St.3d at 20.
In dividing and distributing retirement benefits, the trial court must have the discretion and flexibility to arrive at an equitable decision. The trial court's decision will not be reversed in the absence of an abuse of discretion.
When presented with a pension or retirement fund, the trial court is charged with the goal of preserving the asset so that each party can procure the most benefit. Hoyt,53 Ohio St.3d at 181. Courts have employed four primary methods in attempting to craft an equitable division of retirement assets at the time of a divorce: (1) ordering the withdrawal of the employee's entire share from the fund; (2) offsetting the present value of the nonemployee spouse's equitable share with other marital property; (3) offsetting the present value of the nonemployee spouse's equitable share with installment payments made by the employee spouse; and (4) using a QDRO to order that a percentage of the employee spouse's future benefits be assigned to the nonemployee spouse, if and when the pension reaches maturity. Smith v. Smith
(1993), 91 Ohio App.3d 248, 253, citing Connolly v. Connolly
(1990), 70 Ohio App.3d 738, 743.
In the case of vested matured retirement benefits, the amount due is currently payable. As a result, the value is fixed and easily ascertainable. Hoyt, 53 Ohio St.3d at 182. This was the situation presented by appellant's PFDPF pension. It was both vested and matured, thereby allowing the trial court to order that one-half of the marital portion be assigned to appellee on a monthly basis.
In the case of vested but unmatured retirement benefits, the trial court is faced with a more difficult task. This was the scenario presented by appellant's PERS pension in the case subjudice. The marital asset was appellant's vested right to receive a determinable monthly benefit payable in monthly installments commencing at age sixty-five. Appellant, in other words, had no current right to enjoy his PERS pension. See Smith,91 Ohio App.3d at 253.
Rather than retaining jurisdiction to later rule, the trial court opted to use the present value of the PERS pension in order to apportion appellee's interest in the asset immediately. Appellant argues that the trial court abused its discretion in this regard.
According to appellant, it would have been more equitable for the trial court to have determined the parties' proportionate shares at the time of the divorce, but then subsequently reserved jurisdiction for the purpose of ordering deferred distribution to both parties. Under this scenario, appellee would have to wait until the plan matured in 2010 to receive her interest in the PERS pension. From appellant's perspective, this would be more fair since he is not entitled to his benefits until 2010.
As an initial matter, we would note that the trial court could not use a QDRO to assign appellee the right to receive a portion of the future benefits payable to appellant. PERS is a public pension, and government plans can not be divided by QDROs. See,e.g., Guidubaldi v. Guidubaldi (1990), 64 Ohio App.3d 361, 364.
Thus, the trial court was limited to using one of the aforementioned methods for fashioning a present equitable division of the PERS pension or, alternatively, ordering deferred distribution. The trial court essentially opted to offset the present value of appellee's equitable share by awarding her an additional $8,178.97 in equity in the marital residence.
Upon review, we perceive no abuse of discretion on the part of the trial court. We do not believe that it was overly unfair or inequitable for the trial court to have ordered an immediate distribution of appellee's one-half interest in the PERS pension, even though appellant has no present ability to receive his benefits thereunder.
If the trial court had decided that the PERS pension should be paid through deferred distribution, it would have created a situation wherein the parties' affairs would not be concluded. In the context of pensions and other retirement plans, the Supreme Court of Ohio has strongly recommended that "trial courts, when circumstances permit, should strive to resolve the issues between the parties so as to disassociate the parties from one another or at least minimize their economic partnership." Hoyt,53 Ohio St.3d at 182. In the instant matter, the trial court achieved such finality and disentangled the parties' economic affairs by awarding appellee her present interest in the PERS pension, rather than delaying such distribution until appellant is eligible to receive benefits beginning in 2010.
Moreover, if the trial court had deferred the distribution of appellee's interest in the PERS pension, she would have borne the risk that appellant would die before 2010, thereby terminating the benefits before maturation. The risk to appellee was obviated because she received her interest at the time of the divorce. In exchange for enjoying a present benefit, however, appellee was forced to accept the reduced cash value of her one-half interest in appellant's PERS pension.
Finally, we see no validity to appellant's claim that he does not have sufficient liquid assets from which to pay the $8,178.97 present value of appellee's interest in the PERS plan. The trial court awarded appellee her one-half interest in the form of an increased equitable share in the residence at 248 Ashgrove. Given our prior conclusion that a significant portion of the equity in 248 Ashgrove can be traced as appellant's separate property, this should not amount to a financial imposition on him.
The trial court did not abuse it discretion when it distributed the PERS pension. The seventh assignment is not well-founded.
 VIII.
In his eighth assignment of error, appellant asserts that the trial court erred by failing to consider the tax consequences associated with the division of the PERS pension as required by statute. Appellant asks us to reverse the trial court's distribution of the PERS funds on this basis.
R.C. 3105.171(F)(6) provides:
 "(F) In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:
"* * *
 "(6) The tax consequences of the property division upon the respective awards to be made to each spouse[.]"
Appellant claims that the trial court failed in its statutory duty to consider the tax consequences surrounding the division of appellant's PERS pension. In his brief, appellant observes that although he will have to pay taxes when he begins to receive payments from PERS commencing in 2010, the trial court neglected to consider the tax question when disbursing appellee's interest in the fund. According to appellant, the trial court should have reduced appellee's $8,178.97 lump sum share of PERS monies based on the parties' income tax rate as it existed at the time of trial.
Upon review, we see no reversible error in this regard. Tax consequences are only one factor that the trial court must consider pursuant to R.C. 3105.171(F) when making a division of property. There is nothing to suggest that the trial court did not consider the factors delineated in the statute, including tax consequences.
Furthermore, "this court and other Ohio courts have held that tax consequences of property division that are speculative need not be addressed by the trial court." Letson, 1997 WL 663514, at 7. See, also, Guidubaldi, 64 Ohio App.3d at 367-368; Capper v.Capper (Dec. 14, 1995), Lawrence App. No. 95-CA-8, unreported, at 4, 1995 WL 762923; Murray v. Murray (Oct. 7, 1994), Lucas App. No. L-93-210, unreported, at 3-4, 1994 WL 549511. In this case, the trial court had no way of knowing what the relevant tax rates will be when the PERS pension matures more than a decade hence. SeeDay v. Day (1988), 40 Ohio App.3d 155, 160.
Finally, we would again note that in exchange for enjoying a current benefit, appellee was awarded a reduced amount based on the present cash value of appellant's PERS pension. Thus, while appellant may have to pay taxes when he receives his PERS payments starting in 2010, he will most likely garner more in the long run from his one-half interest in the pension plan than appellee will garner from her corresponding present share.
The trial court was not obligated to assign a reduced value to appellee's lump sum share of the PERS pension based on tax consequences. The eighth assignment is meritless.
 IX.
In his ninth assignment of error, appellant proposes that the trial court erred by failing to consider the money that appellee received from the PERS distribution when the court determined the question of spousal support. Appellant asks this court to reverse the spousal support order with instructions for the trial court to recalculate an appropriate amount of support in light of the $8,178.97 lump sum PERS distribution given to appellee.
As an initial matter, we would note that the judgment of the trial court with respect to spousal support has already been reversed on other grounds. See Part V, supra. We will, however, briefly address this proposed error in order to determine whether it constitutes an alternative basis for reversing the trial court's spousal support order.
Prior to January 1, 1991, the version of R.C. 3105.18 in effect at that time governed alimony, which took the nature of both the property division and the sustenance/support of a spouse. Effective January 1, 1991, however, the issues of property division and spousal support were separated into component parts governed by R.C. 3105.171 and 3105.18, respectively.
The trial court must now divide the parties' property before considering the issue of spousal support. See R.C. 3105.18(B). Once the property is divided, the trial court must determine whether an award of spousal support is appropriate and reasonable in light of the division of property that has already taken place. Indeed, R.C. 3105.18(C)(1)(a) requires the trial court to consider any income that will be derived from property previously divided and distributed under the auspices of R.C. 3105.171. Moreover, the trial court is further obliged to take into account the "relative assets and liabilities of the parties" under R.C. 3105.18(C)(1)(i), thereby covering any non-income producing property.
In his brief, appellant points out that the PERS funds were not disposed of by the original divorce decree. Such funds were disbursed only after this court remanded the matter for the trial court to rule on appellee's Civ.R. 59 motion. On remand, the trial court divided this marital asset pursuant to its February 2, 1999 judgment entry, which effectively supplemented the prior divorce decree.
Thus, we would agree with appellant that it stands to reason that the trial court was not considering the PERS distribution when it ordered him to pay the spousal support specified by the divorce decree. Thus, the trial court did not have the benefit of a complete picture of the parties' respective assets and liabilities in the wake of the property division.
When reconsidering the question of spousal support on remand, the trial court is instructed to exercise its discretion in considering the $8,178.97 lump sum PERS distribution given to appellee. The ninth assignment is well-taken to the extent indicated.
 X.
In her first assignment of error on cross-appeal, appellee contends that the trial court abused its discretion when it failed to award her attorney fees as a form of additional spousal support. According to appellee, the trial court should have ordered appellant to pay the costs that she incurred in litigating the divorce.
Prior to the issuance of the divorce decree, appellee filed an itemized statement of services covering attorney fees and other expenses accrued during the litigation of the instant matter. The total bill was $29,388.38. Appellee submitted this statement in furtherance of her request that she be awarded attorney fees as part of the divorce settlement. Attached to the bill were affidavits from the two attorneys who had represented appellee during the divorce proceedings. In these affidavits, the attorneys averred that their fees were reasonable and necessary to protect their client's interests.
Although the issue had been raised, the trial court overlooked the question of attorney fees in the original divorce decree. Consequently, appellee raised, inter alia, the topic of attorney fees again in her Civ.R. 59 motion for a new trial. Upon ruling on this motion in its February 2, 1999 judgment entry, the trial court decided that each party should pay his or her own fees incurred as a result of the divorce. Appellee now asserts that the trial court abused its discretion in this regard.
When a party requests attorney fees in the original divorce proceedings, R.C. 3105.18(H) is the applicable statute. It reads:
 "In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees."
The plain language of R.C. 3105.18(H) authorizes the trial court to award reasonable attorney fees to either party at any stage of the proceedings. An allowance for the payment of attorney fees is generally designated as a type of spousal support in light of the fact that the relevant statutory authority is subsumed within R.C. 3105.18.
Before awarding attorney fees, the trial court must make a twofold determination: (1) the court must ascertain whether the other party has the ability to pay the requesting party's attorney fees; and (2) the court must consider whether either party will be prevented from fully litigating his or her rights and adequately protecting his or her interests if it does not award reasonable attorney fees.
The general rule is that the decision whether to award attorney fees is matter within the sound discretion of the trial court. In the absence of a clear abuse of discretion, a reviewing court will not reverse the judgment of the trial court. Birath v. Birath
(1988), 53 Ohio App.3d 31, 39.
Upon review, we do not believe that the trial court abused its discretion by ordering each party to pay his or her own attorney fees. First, based on the divorce settlement as decreed by the trial court, appellant is not necessarily in a significantly better position than appellee in terms of having the ability to pay the latter's attorney fees. Although appellee hastens to point out an alleged disparity in gross income between the parties, she ignores certain income streams that she is entitled to under the divorce decree. For instance, she is to receive $665.97 per month in PFDPF benefits as a form of marital property. Beyond this, the trial court did decree that appellee should receive spousal support. A portion of this monthly stipend could be used to retire the debt she incurred in litigating the divorce. Second, there is also no indication that appellee has been up to this point, or will be in the future, prevented from fully litigating her rights and adequately protecting her interests in light of the trial court's decision not to award her attorney fees.
In her brief, appellee concedes that both parties had substantial attorney fees as a result of the litigation. It must be noted that the payment of attorney fees is primarily the function of the party who retains the attorney. It is not an equal obligation of both parties. Farley v. Farley (1994), 97 Ohio App.3d 351, 358. While R.C.3105.18 authorizes the trial court to order that one party be required to pay for some or all of the other party's legal fees under certain conditions, the court must make the determination equitably and fairly to serve the ends of justice. Id.
In the case at bar, the trial court obviously determined that it would be equitable and just if each party bore the burden of paying his or her own attorney fees. We can not say that this was an abuse of the trial court's discretion. The first assignment in the cross appeal lacks merit.
Again, however, we must note that the trial court is free to revisit the question of attorney fees on remand. Although we have determined that the trial court did not abuse its discretion with respect to the allocation of such fees, that conclusion is based on the findings of fact and conclusions of law made by the court during the initial litigation of this contested divorce. Should the trial court's findings and conclusions change significantly on remand, the court may review its original determination regarding this issue. Also, the trial court may address any additional attorney fees generated during the continuing litigation of this matter as it deems fit after issuing new rulings regarding property distribution and support concerns.
 XI.
In her second assignment of error on cross appeal, appellee sets forth the proposition that the trial court abused its discretion in dividing a checking account maintained by the parties in appellant's name at Metropolitan Savings Bank. In the divorce decree, the trial court disposed of this asset in the following manner:
 "The Husband's checking account at Metropolitan Savings Bank was divided by the parties and any current balance shall be the property of Husband."
The inference to be drawn from the trial court's division of this asset is that appellee had already received her equitable share of the checking account, thereby entitling appellant to the balance that remained at the time of trial. On appeal, appellee claims that there was no evidence offered to support the trial court's finding that this checking account had been divided between the parties prior to trial. In essence, appellee implies that she never received her fair share of this checking account and that the trial court, therefore, abused its discretion by failing to divide the funds therein on an equitable basis.
Based on the record before this court, appellee's assertion appears to be simply untrue. In the written stipulations submitted at trial, the parties stipulated as to the following in regard to the Metropolitan Savings Bank checking account:
 "16. Defendant has a checking account at Metropolitan Savings Bank * * * with a balance on 9/15/97 of $4,354.17 which is a marital asset. Activity thereafter is non-marital. $2,000 of same was used to pay the cash advance taken by Plaintiff on 8/7/97.
"* * *
 "18. On 8/7/98[,] Pltf. took a [$]4,000 cash advance w/a $50 service charge on First USA Visa which was paid w/marital funds from Metrop. [Savings Bank] on 10/24/97."
The evidence at trial showed that appellee took a $4,000 cash advance on a First USA Visa card maintained in appellant's name on August 7, 1997. This was less than one month before appellee filed for divorce from appellant.
Stipulation #16 clearly demonstrates that the Metropolitan Savings Bank checking account had a balance of $4,354.17 on September 15, 1997. The parties agreed that this was a marital asset, but that any activity thereafter was nonmarital in nature. Stipulation #18 then shows that appellee used $2,000 from the checking account on October 24, 1997 to pay one-half of the $4,000 First USA cash advance that she previously took. Thus, appellee not only received, but spent, $2,000 from the checking account after she filed for divorce.
Indeed, Stipulation #17 reveals that appellee used $2,000 from a Metropolitan Savings Bank savings account to pay the other half of the aforementioned $4,000 credit card cash advance. In the divorce decree, therefore, the trial court awarded appellant a $2,000 offset from this savings account before distributing the balance of the funds evenly between the parties. The trial court gave appellant the $2,000 offset because appellee had already withdrawn an equal amount from the savings account after the divorce proceedings had been instituted.
In the case of the checking account, appellee used $2,000 of the $4,354.17 in marital funds that were in the account as of September 15, 1997. Although this was not quite one-half of the funds, the trial court obviously decided that it was close enough for purposes of equitably distributing this marital asset. As a result, the trial court awarded the balance in the checking account to appellant. The trial court did not abuse its discretion in this regard. The second assignment in the cross appeal is not well-taken.
 XII.
Based on the foregoing analysis, the first, second, fifth, and ninth assignments of error raised by appellant are well-taken to the extent indicated. Neither assignment of error raised by appellee in the cross-appeal is meritorious. Accordingly, the judgments of the trial court are affirmed in part and reversed in part, and the matter is hereby remanded for further proceedings consistent with this opinion.
 _________________________ JUDGE JUDITH A. CHRISTLEY
FORD, P.J., O'NEILL, J., concur.
[1] For simplicity's sake, we will simply refer to the parties as "appellant" and "appellee," even in the context of addressing the cross appeal.
[2] This court relied on the final paragraph of Civ.R. 59(A). It provides as follows:
 "On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and enter a new judgment."
[3] These assignments have been renumbered accordingly.
[4] Appellee's assignments on cross appeal have been renumbered to correspond sequentially to the assignments raised by appellant in his appeal.
[5] The street on which this house is located is referred to as "Ashgrove" and "Ash Grove" at various points throughout the record. We will use the former.
[6] We would note that this excerpt from the divorce decree obviously contains a typographical error in light of the fact that two different dollar amounts are used as the fair market value of the residence at 248 Ashgrove.
[7] Beyond the written stipulations, the following discussion took place near the conclusion of the trial:
 "[APPELLEE'S COUNSEL]: You want us to stipulate that part of the proceeds from 214 [Solon] went for the down payment and part went to improve the home? That's what you're asking?
 "[APPELLANT'S COUNSEL]: The proceeds from 214 Solon Road were used as a bridge loan for the down payment and then the net proceeds to finish the house.
 "[APPELLEE'S COUNSEL]: And part of it went into the marital account, the $50,000 deposit.
 "[APPELLANT'S COUNSEL]: The $53,000 deposit is what was used to complete the home.
"* * *
 "[APPELLEE'S COUNSEL]: We have no problem with stipulating the proceeds from 214 [Solon] went into a combination of the down payment —
"THE COURT: And finishing?
"[APPELLEE'S COUNSEL]: — and improvements.
"[APPELLANT'S COUNSEL]: And finishing the home.
 "[APPELLEE'S COUNSEL]: Along with the equity line of credit loan, the proceeds from 214 [Solon], as well as the equity line of credit, completed the home.
"[APPELLANT'S COUNSEL]: Fine."
[8] The fair market value was actually stipulated by the parties to be $27,500. The $27,000 figure, though, became the value when it was memorialized by the trial court in the divorce decree.
[9] For instance, the trial court stated that appellee's annual income was $18,000 when allocating the marital debts in a different section of the divorce decree. See Part IV, supra.